STEBBINS v. MICHIGAN WHEELBARROW & TRUCK CO. et al.

(Circuit Court, E. D. Michigan, N. D.   September 12, 1911.)

No. 69.

CORPORATIONS (§ 320*)—STOCKHOLDERS' SUIT—GROUNDS.

    Where a corporation has continued to do business at a loss until the market value of its assets does not exceed its liabilities, and it is without funds to continue as a going concern, so that its stock has no substantial value, a minority stockholder cannot recover damages from the majority stockholders because of their action in transferring the property and business of the corporation to a purchaser in consideration of his assumption of its debts, even if such transfer was not authorized by law.

    [Ed. Note.—For other cases, see Corporations, Dec. Dig. § 320.*

    Rights of minority stockholders as to management of corporate affairs, see note to Wheeler v. Abilene Nat. Bank Bldg. Co., 89 C. C. A. 482.]

In Equity.   Suit by Bliss Stebbins against the Michigan Wheelbarrow & Truck Company and others.   Decree for defendants.

Robert S. Woodliff and Dayton W. Closser, for complainant.
Weadock & Weadock, for defendants.

ANGELL, District Judge.   This is a stockholders' bill filed by complainant in his own behalf and in behalf of others similarly situated against the Michigan Wheelbarrow & Truck Company, a corporation in which he held stock, the Saginaw Wheelbarrow Company, a company which acquired the property of the Michigan Wheelbarrow & Truck Company, and against various stockholders of the two companies.   Richard S. Woodliff as assignee of a portion of the stock of the Michigan Wheelbarrow & Truck Company formerly owned by complainant, Stebbins, was allowed to intervene as a complainant.

The bill attacks a transfer from the Michigan Wheelbarrow & Truck Company of all its property, subject to its debts, to the Saginaw Wheelbarrow Company, and contains prayers for a receiver and an accounting, and for payment to complainant of the value of the property represented by his stock.   During the progress of the litigation, under an order, a bond was filed by the defendants to make good any loss which the complainant should be held to have suffered, and the relief now sought by complainant is a money decree.   The transfer complained of was voted by the Michigan Wheelbarrow & Truck Company in December, 1905, and carried through in January, 1906. The Michigan Wheelbarrow & Truck Company had been organized several years before.   The complainant was one of the original stockholders, and for about three years prior to July, 1905, had acted as manager of the company, and had also been its secretary.   Its business had never been successful.   During the period of his connection with the company as an officer, various attempts had been made to improve matters, but without success.   An effort to consolidate the company with some other concern of a like kind failed.   An effort by it to issue mortgage bonds failed.   An effort to increase the capital stock by issuing preferred stock likewise failed.   In August, 1904, the company arranged for a credit of $70,000 at some of the banks in Saginaw upon the indorsement of four of its stockholders, including complainant.   To protect these indorsers to the extent of $50,000, each of the stockholders in August, 1904, deposited certain stocks with a trustee, and the complainant deposited in this way several thousand dollars worth of stocks which he owned.   This agreement by an extension dated July 25, 1905, was to remain in force until August 22, 1906. By dint of this credit the company was enabled to carry on its business in spite of steady losses up to July, 1905, when matters had come to such a pass that Stebbins was requested to resign as general manager.   This he did, and a man by the name of Thomas Jackson, a manufacturer in Saginaw, was procured to take the management of the business in the hope that it could be made a success.   Mr. Jackson assumed control about August 1, 1905, on an understanding that he was to have a small salary, and that, if after six months the outlook warranted such course, he was to become permanently connected with the concern, and have $5,000 worth of its stock turned over to him.   The stockholders deposited with a trustee enough stock of the company to carry out this arrangement with Mr. Jackson.   The complainant thus deposited stock of the face value of $3,000.

Almost immediately after Mr. Jackson's appointment, trouble with

complainant began. The other stockholders were not only much dissatisfied with Stebbins' management, but, justly or unjustly, became suspicious of his good faith and impressed with the idea that he was endeavoring to build up the business of 'the Lansing Wheelbarrow Company at the expense of the Michigan Wheelbarrow & Truck Company, he having a considerable stock interest in the Lansing Wheelbarrow Company, and entering its employ in the autumn of 1905. When he left Saginaw in August, 1905, he carried with him the record book of the company to his summer home in Presque Isle county, and refused to return it upon demand, and omitted to attend meetings of the board. As he was not easily reached at his summer home, and as the bank paper was falling due from time to time, he was asked, instead of indorsing renewals, to sign a guaranty bond with his fellow stockholders so that indorsements would not be necessary; but this he refused to do. As a result of this course of conduct on his part, in September, 1905, he was removed from the office of secretary of the company.

Mr. Jackson and the other officers became satisfied during the autumn of 1905 that without a fresh contribution of money the business of the company could not be made a success. This fact, added to the friction between Stebbins and his fellow stockholders, resulted in the calling of a meeting of the stockholders in November to determine whether it would be possible to raise the funds necessary for continuance of the business, and, if not, then to determine the advisability of selling the business if a purchaser could be found. At that meeting the stockholders voted to sell the property in order to pay its debts. The vote was 3,300 shares against 1,300.

Some effort, though the complainant insists no serious effort in good faith, to find a purchaser was made; but up to the end of December none was found. At an adjourned stockholders' meeting held near the end of December, 1905, the stock standing of record in the name of Mr. Stebbins was represented by Mr. Woodliff, who claimed to have bought from Mr. Stebbins the $3,000 of stock deposited with the trustee under the Jackson agreement, and by Mr. Closser who held a proxy from Mr. Stebbins for the remainder of his stock. At that meeting an offer to buy the property of the concern and assume its debts was received from Harker W. Jackson and Alfred A. Alderton. These gentlemen offered to pay the sum of $73,884.91 and to assume the debts of the concern which amounted to substantially that sum. This offer was accepted by a vote of 3,100 shares against 1,300; the negative votes being Mr. Woodliff 300 shares, Mr. Stebbins by Closser proxy 940 shares, and Mr. Card, a relative of Stebbins, 60 shares. The total number of outstanding shares of stock were 5,000. Six hundred shares were not voted on the question. Shortly after this meeting conveyances of the property were made to Mr. Harker W. Jackson and Mr. Alfred A. Alderton. Thereafter, in January, with Mr. Thomas Jackson, these gentlemen, none of whom were stockholders in the Michigan Company, organized the Saginaw Wheelbarrow Company, and turned over to it the property acquired from the Michigan Wheelbarrow & Truck Company. Immediately thereafter sev-

eral of the stockholders of the Michigan Company became stockholders of the Saginaw Company. The complainant, Woodliff, Card, and three other stockholders of the Michigan Company did not become holders in the Saginaw Company; Woodliff, Card, and Stebbins, at least, not being given an opportunity at the time to become such. No money was paid by the purchasers to the Michigan Wheelbarrow Company. In substance, though not in form, the transaction was this: The notes of the Michigan Company were canceled and surrendered upon the substitution for them of notes of the Saginaw Company indorsed by some of its stockholders. The collateral deposited with the trustee to secure the indorsers of the Michigan Company's notes was surrendered to the depositors thereof. The $25,000 fresh money paid into the treasury of the Saginaw Company was the only money passing on the transaction.

It is quite clear that this plan of financing the new company was worked out before its actual organization was completed, and that some, at least, of the indorsers of the Michigan Company's notes expected to become indorsers for and stockholders in the new company. The assets of the Michigan Company were stated in the articles of association of the Saginaw Company to be taken over as worth $25.000 above the debts of the Michigan Company. which the Saginaw Company assumed. Twenty-five thousand dollars of fresh money was contributed by the stockholders of the Saginaw Company, and it started upon its career with what was said to be a full paid capital of $50,000. After the Saginaw Company was organized, three of the small stockholders of the Michigan Company who did not go into the new company sold their stock to persons who did go into it. One was paid 10 cents on $1; one, 20 cents; and one, 30 cents, for his stock of the old concern. At the meeting in December, and after the vote to sell, one of the stockholders offered to pay $500 for all the Stebbins stock in order to prevent, as he said, any opposition to reorganizing. At that time Mr. Woodliff, basing himself on what he then knew of the property, expressed his willingness to take his proportion of the amount for the three hundred shares he claimed, and Mr. Closser, representing Mr. Stebbins, was understood to state that he would advise Mr. Stebbins to accept the offer. It was not accepted. In the August following this bill was filed.

The testimony in the case is very voluminous, and the foregoing is a brief statement of what appears to be either substantially undisputed or obviously true.

The contention on the part of the complainant is that the individual defendants conspired to drive the complainant out of the Michigan Wheelbarrow & Truck Company, and to acquire for themselves the whole value of its assets, and that their efforts succeeded; that the purchase through Harker W. Jackson, son of Thomas Jackson, and Alfred A. Alderton, son of George A. Alderton, a large stockholder in the Michigan Wheelbarrow & Truck Company, was a mere device or cover for the carrying out of this conspiracy; that the sale was illegal, in that thirteen-fiftieths of the stock voted against, and only thirty-one-fiftieths for, the transfer; that the property and good will

191 F.—16

of the selling company had a large value at the time over and above the debts of the concern; that complainant's stock represented value of which he was unlawfully deprived.

On the other hand, the defendants contend that there was no conspiracy to deprive Mr. Stebbins of the benefit of his stock; that the sale was made in good faith, and was warranted by law; that the company was substantially insolvent; that its stock had no value; that the price at which Jackson and Alderton took over the property was more than it was worth. It is fair to say that the stockholders were advised by counsel when the sale was voted that a valid sale could be made under the vote.

The question which first presents itself, in view of these contentions, is that as to the value of the complainant's stock in December, 1905. It is not possible upon this record to determine, with exactness, what the value of the property of the Michigan Wheelbarrow & Truck Company was at the end of December, 1905. There is no doubt that it owed at that time more than $70,000, nor is there any doubt that it could not pay its paper which was coming due from time to time. Mr. Stebbins' absence rendered it practically impossible to renew the paper by indorsements, and he had declined to sign the bond of guarantee which would render indorsements unnecessary. Unless new money was put into the business in some way, it is plain to me that the company would have had to wind up its operations.

Various statements relative to the business of the company from year to year, and estimates as to the worth of its property on hand during the latter part of 1905, were introduced in evidence. The estimates treated the company as a going concern. The lowest estimate of the kind was made by Mr. Harker W. Jackson, and it is said, and probably with truth, that upon this the stockholders acted when their final vote was taken to sell. This estimate, fixing the value at about $77,000, is very sharply attacked by the complainant as unfair and too low. In view of all the testimony I cannot bring myself to conclude that, even if a purchaser could have been found other than Jackson and Alderton, such person would have offered more than they did; nor can I believe that a sale in liquidation would have yielded as large an amount net as $73,000, nor enough to have paid the debts of the concern. If the purchase price should not have paid the debts, the indorsers upon the paper would have had to make good the deficiency or have suffered the loss of the stocks or other securities which had been deposited with the trustee, as above stated.

It is strongly urged that the articles of association of the Saginaw Wheelbarrow Company show that this property was worth at least $25,000 above the debts of the Michigan Wheelbarrow & Truck Company, and that, therefore, the stock of the last-named company was worth at least 50 cents on the dollar. It must be remembered, however, that $25,000 of fresh money had been put into the concern when the articles were filed. That contribution may have been large enough to make the property of the old concern worth, in the eyes of the organizers, $25,000 above its debts. But, even if this be so, it is certainly no evidence that the property without an increase of the capital with

which to run it was worth anything above the debts. In my judgment it was worth nothing above those debts.

If my conclusion upon this matter of fact is correct, the complainant has sustained no substantial wrong, even if, as contended by complainant, the majority stockholders of the old company purposely excluded him from the new, and made a sale which was not warranted by law. If the stock was worthless, illegal action on the part of the majority stockholders in making the sale would not afford a basis for a decree against them for the value of the stock. Thoman v. Mills, 159 Mich. 402, 124 N. W. 33. It is to be observed that, as a result of the transfer to the Saginaw Company by the Michigan Company, the paper indorsed by the complainant was retired, his legal obligations canceled, and his collateral released and returned to him or his assignee, and, likewise, that his obligation to contribute stock to Mr. Thomas Jackson was terminated, and his stock in the Michigan Company deposited in that connection was also released, and he was enabled thus to fulfill his contract with Woodliff for the sale of that stock. Complainant certainly derived a substantial benefit from the transfer, of which he complains, in the return of his securities and the release of all personal obligations on about $50,000 of company paper.

Having reached these conclusions as to the value of Mr. Stebbins' stock in the Michigan Wheelbarrow & Truck Company, it is unnecessary to determine the other matters discussed at the bar.

A decree must be entered dismissing the bill.